*Ronnie Hunt v. State of Maryland*, No. 21, September Term, 2020.  Opinion by Harrell, J.

**Criminal Law—Petition for Writ of Actual Innocence—Whether Evidence is Newly Discovered—Incorporation by Reference of Due Diligence Requirement of Maryland Rule 4-331(c)**

A court addressing the merits of a petition for writ of actual innocence, filed pursuant to Maryland Code (2001, 2018 Repl. Vol.), Criminal Procedure Article ("CP"), § 8-301, must determine whether the evidence presented is newly discovered.  Newly discovered evidence "could not have been discovered in time to move for a new trial under Maryland Rule 4-331."  Under Rule 4-331(c), a court "may grant a new trial or other appropriate relief on the ground of newly discovered evidence which could not have been discovered by due diligence in time to move for a new trial pursuant to" Rule 4-331(a), that is, within ten days after a verdict.  Thus, the actual innocence statute incorporates by reference the due diligence requirement of Rule 4-331(c).

**Criminal Law—Petition for Writ of Actual Innocence—Due Diligence**

"Due diligence" contemplates that the defendant act reasonably and in good faith to obtain the evidence, in light of the totality of the circumstances and the facts known to the defendant.

**Criminal Law—Petition for Writ of Actual Innocence—Due Diligence Requirement—Kopera Cases**

Under the unique circumstance of Joseph Kopera's fraud on the courts of Maryland, which had gone undetected for many years until its fortuitous discovery by a postconviction attorney from the Innocence Project, working on an unrelated case in 2007, we hold that, in this and all similarly situated cases tried prior to the 2007 discovery of Kopera's fraud, in the absence of particularized facts that would have put defense counsel on inquiry notice indicating a need to investigate Kopera's purported academic qualifications, due diligence did not require defense counsel to unearth it prior to 2007.

**Criminal Law—Petition for Writ of Actual Innocence—Prejudice Standard**

The prejudice standard of CP § 8-301(a)(1)(i), that a petitioner must prove that newly discovered evidence "creates a substantial or significant possibility that the result may have been different," is substantially similar to the standard applicable to claims of ineffective assistance of counsel and claims alleging a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and its progeny.  It is therefore unnecessary to perform a bifurcated analysis of "materiality" followed by application of the prejudice standard.

Circuit Court for Baltimore City
Case No. 191136027
Argued: December 8, 2020

IN THE COURT OF APPEALS

OF MARYLAND

No. 21

September Term, 2020

_____

RONNIE HUNT

v.

STATE OF MARYLAND

_____

McDonald,
Watts,
Hotten,
Getty,
Booth,
Biran,
Harrell, Glenn T., Jr.,
    (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Harrell, J.
Watts and Biran, JJ., concur.
_____

Filed: June 7, 2021



Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.

Suzanne C. Johnson, Clerk

It took Dorothy some time to discover that the reputation of the "all-powerful" Wizard of Oz was not precisely as advertised. Perhaps, had she exercised some diligence in vetting him on the front-end of their encounter, she might have spared herself and her traveling companions the misadventures suffered at the hands of the Wicked Witch of the West (and her flying monkeys) at her castle. Nonetheless, no one dare fault her for relying initially on the accreted high opinion of the Wizard.

There seems to us some similarities between Dorothy's and the Wizard's relationship and this case. Unfortunately, the consequences of the late Joseph Kopera's deception of Maryland's courts, the Bar, and defendants for decades in a host of criminal cases in which he testified for the State as an "expert" in the field of firearms ballistics, based in part on later-discovered falsities in his academic curriculum vitae, have not proved to be resolved easily by legal wizards.[1] In an effort to cut through at least a strand of the larger Gordian Knot left in the wake of the 2007 discovery of Kopera's misrepresentations, we shall adopt a somewhat outside-the-lines resolution of the present case in order to clear

---

[1] According to a newspaper article headlined, "Police expert lied about credentials," by Jennifer McMenamin, published 9 March 2007, in the *Baltimore Sun*, Kopera claimed in court to have degrees that he had not earned in fact. Kopera testified frequently that he had a degree from the Rochester Institute of Technology ("RIT") in photographic science/engineering and, on at least one occasion, testified that his RIT degree was in aerospace engineering. Kopera claimed also to have a mechanical engineering degree from the University of Maryland. The 2007 article reported that Kopera had forged at least one document (a transcript that he claimed was from the University of Maryland) offered originally to attorneys with the Innocence Project, attempting to justify his qualifications. In response to further questions from the attorneys at the Innocence Project, Kopera provided allegedly a "certificate of training" from the United States Air Force, to what intended curative effect remains opaque.

a path for Maryland courts to get more quickly to the more taxing question of whether Kopera's deceit, once discovered, created, under Maryland's actual innocence statute, "a substantial or significant possibility that the result [of the trial] may have been different." Md. Code (2001, 2018 Repl. Vol.), Criminal Procedure Article ("CP"), § 8-301(a)(1)(i). We shall hold that, in this case and in all similarly situated "Kopera cases," trial counsel were not expected reasonably to uncover Kopera's deception before 2007, in the absence of specific information that should have put counsel on inquiry notice to investigate sooner Kopera's background.

## BACKGROUND

This is the second time we have considered the actual innocence petition of Petitioner, Ronnie Hunt. In the previous iteration of this case, we held that Hunt was entitled to a hearing on his petition in the Circuit Court for Baltimore City. *State v. Hunt*, 443 Md. 238, 116 A.3d 477 (2015) ("*Hunt I*"). In the present iteration, we are asked to determine whether the alleged newly discovered evidence underlying his claim, that is, the belated discovery that the State's ballistics expert, Joseph Kopera, had testified falsely in 1991 at Petitioner's trial about his educational background and experience, could not have been discovered reasonably in time to move for a new trial under Maryland Rule 4-331,[2] as required under Maryland's actual innocence statute, which provides in relevant part:

---

[2] In 1991, when Hunt was tried, Maryland Rule 4-331 provided in relevant part:

**(a) Within Ten Days of Verdict.** — On motion of the defendant filed within ten days after a verdict, the court, in the interest of justice, may order a new trial.

2

(a)  A person charged by indictment or criminal information with a crime triable in circuit court and convicted of that crime may, at any time, file a petition for writ of actual innocence in the circuit court for the county in which the conviction was imposed if the person claims that there is newly discovered evidence that:

> (1)(i)  if the conviction resulted from a trial, creates a substantial or significant possibility that the result may have been different, as that standard has been judicially determined; or
> (ii) if the conviction resulted from a guilty plea, an Alford plea, or a plea of nolo contendere, establishes by clear and convincing evidence the petitioner's actual innocence of the offense or offenses that are the subject of the petitioner's motion; and

> (2) could not have been discovered in time to move for a new trial under Maryland Rule 4-331.

---

**(b)  Revisory Power.** — The court has revisory power and control over the judgment to set aside an unjust or improper verdict and grant a new trial:
> (1) in the District Court, on motion filed within 90 days after its imposition of sentence if an appeal has not been perfected;
> (2) in the circuit courts, on motion filed within 90 days after its imposition of sentence.

Thereafter, the court has revisory power and control over the judgment in case of fraud, mistake, or irregularity.

**(c)  Newly Discovered Evidence.** — The court may grant a new trial or other appropriate relief on the ground of newly discovered evidence which could not have been discovered by due diligence in time to move for a new trial pursuant to section (a) of this Rule:
> (1) in the District Court, on motion filed within one year after its imposition of sentence if an appeal has not been perfected;
> (2) in the circuit courts, on motion filed within one year after its imposition of sentence or its receipt of a mandate issued by the Court of Appeals or the Court of Special Appeals, whichever is later.

* * *

Although the rule has been amended several times since then, none of those amendments has any bearing on this case.

CP § 8-301(a).[3]

We refer to *Hunt I* for context:

> Following a jury trial spanning several days in September of 1991, Ronnie A. Hunt, Jr. ("Hunt") was convicted on 25 September 1991 in the Circuit Court for Baltimore City of first-degree murder and use of a handgun in the commission of a crime of violence. The jury found that Hunt, along with his co-defendant, Harry Johnson, III, on 10 April 1991 shot to death Sheldene Simon on the front lawn of the victim's home in Baltimore during a gunfight involving multiple shooters. Hunt was sentenced to life imprisonment for murder, plus a consecutive twenty years for the handgun offense. Hunt's convictions were affirmed in 1993 by the Court of Special Appeals on direct appeal in an unreported opinion.

*Hunt I*, 443 Md. at 242, 116 A.3d at 479.

Hunt sought unsuccessfully postconviction relief. Thereafter, on 30 September 2010, Hunt, having become aware of the revelation in 2007 of the scandal surrounding Kopera's perjured testimony in hundreds[4] of criminal trials, filed *pro se* a petition for writ

---

[3] Since Hunt filed his original petition in 2010, CP § 8-301(a) has been amended to include expressly the ability of a person convicted by way of a guilty plea to file a petition under the statute. 2018 Md. Laws, ch. 602. As Hunt was convicted following a jury trial, that amendment has no effect on this case. Thus, we concern ourselves with the current version of the statute.

[4] We do not have a firm figure as to precisely how many trials were tainted potentially by Kopera's misrepresentations. According to the 2007 McMenamin article in the *Baltimore Sun*, cited previously, *supra* note 1, Kopera's testimony had helped to convict "hundreds" of defendants. According to a newspaper article headlined, "Firearms expert forged signatures on lab reports, Maryland State Police say," by Dan Morse, published 28 December 2019, in the *Washington Post*, there are more than 4,000 cases implicated potentially. That source does not say whether any of these cases were resolved by guilty pleas and, if so, how many, but in any event, even persons who pleaded guilty may have recourse to raise a Kopera claim (at least a claim alleging that Kopera had falsified a signature on a lab report), given the 2018 amendment to the actual innocence statute.

4

of actual innocence in the circuit court, which he amended several months later. Hunt's

first amended petition[5] averred, among other things, "that his federal Constitutional Rights

to due process and equal protection of the law afforded under the Fifth and Fourteenth

Amendments were denied him 'based on false evidence.'" *Hunt I*, 443 Md. at 243, 116

A.3d at 479-80. Hunt described the discovery, by an attorney working for the Innocence

Project, of Kopera's false testimony in numerous criminal trials concerning his credentials.

*See id.* at 243-44, 116 A.3d at 480 (quoting in detail Hunt's first amended petition). He

maintained further that "Kopera's testimony in his capacity as the State's ballistics expert

was the State's "'only evidence' against him and 'the linch pin in the State's case'." *Id.* at

244, 116 A.3d at 480. He concluded, had Kopera's "fake credentials and/or false

testimony" been known, "it is reasonably probable that the outcome of the trial would have

been different[,] because his testimony probably would not have been as credible." *Id.*

The circuit court denied Hunt's first amended petition, without a hearing, on the

ground that it "fail[ed] to state a claim or assert grounds for which relief may be granted

pursuant to [§ 8-301(a)]." Hunt (self-represented) appealed,[6] and the Court of Special

Appeals, in an unreported opinion that relied upon *Douglas v. State*, 423 Md. 156, 31 A.3d

250 (2011), reversed and remanded for a hearing. *Hunt v. State*, No. 162, Sept. Term, 2011

---

[5] Following our decision in *Hunt I*, Hunt filed another amended petition for writ of actual innocence. Although it was captioned as an "Amended Petition," we shall denote the later-filed petition as his second amended petition to avoid confusion.

[6] The docket entries indicate that Hunt filed (unrepresented) an application for leave to appeal, which the Court of Special Appeals treated apparently as a notice of appeal.

(filed 20 June 2014) (per curiam).  The State sought further review by means of a petition

for writ of certiorari.  *State v. Hunt*, 440 Md. 225, 101 A.3d 1063 (2014).  We granted the

writ and affirmed the judgment of the intermediate appellate court.  *Hunt I*, 443 Md. 238,

116 A.3d 477 (2015).  The matter was remanded to the circuit court for a hearing.

Upon remand, Hunt, now represented by counsel,[7] filed a second Amended Petition

for Writ of Actual Innocence, alleging:

> Petitioner's petition for a writ of actual innocence is based on the evidence
> that the State's expert witness in ballistics analysis who testified at his trial,
> Joseph Kopera, lied about his academic credentials while under oath in that
> trial and on countless prior occasions.[8]  This evidence could not have been
> discovered through due diligence in time to move for a new trial pursuant to
> Md. Rule 4-331.
>
> * * *
>
> Mr. Kopera lied while under oath at Petitioner's trial that he had earned "a
> degree in mechanical engineering from the University of Maryland and also
> an engineering degree from the Rochester Institute of Technology."  This
> evidence was discovered in 2007 by a post conviction lawyer [in an unrelated
> case] who investigated Mr. Kopera's academic credentials while
> representing a client whose convictions were partly based on his expert
> witness testimony.
>
> The evidence that Mr. Kopera lied for decades about his academic credentials
> could not have been discovered in time to move for a new trial pursuant to
> Md. Rule 4-331 in light of the totality of the circumstances and the facts
> known to Petitioner.  Those circumstances and facts included the enduring

---

[7] Hunt is represented now by counsel from Maryland's Office of the Public Defender.

[8] "With a career spanning 37 years, Kopera [testified in] criminal cases in every one of Maryland's 24 jurisdictions as well as in Delaware, Pennsylvania and Virginia and at both the state and federal level, said Col. Thomas E. 'Tim' Hutchins, superintendent of the Maryland State Police."  McMenamin, *supra* note 1.  As noted previously, his testimony was advanced by the State in its efforts to convict (at least) "hundreds" of defendants.

presumption that the State will present truthful testimony and exculpatory evidence, Mr. Kopera's long-standing reputation as a competent ballistics expert, and the helpful evidence that he presented in Hunt's case. Petitioner relied on that reputation and that evidence to shape his defense theory, which was to present alternative suspects for the crimes with which he was charged. Petitioner cannot be expected to have found Mr. Kopera's lies amid circumstances that contrast markedly with the conditions surrounding their incidental discovery in a radically different legal context.

Second Amended Petition, filed 6 February 2017, at 5-6 (citation and quotation omitted).[9]

Following a hearing, the circuit court denied Hunt's second amended petition on the sole ground that Kopera's false testimony concerning his credentials was not newly discovered evidence. The circuit court did not address whether Hunt had demonstrated a "substantial or significant possibility" that, but for Kopera's perjured testimony, the outcome of his trial may have been different. We quote from the circuit court's memorandum opinion:

> Although the Petitioner submitted very little actual evidence about the discovery of Kopera's false credentials, the Court finds that it is well established that Kopera's false credentials were discovered in 2007 during postconviction litigation in the case of *Kulbicki v. State* in the Circuit Court for Baltimore County. The attorney representing Kulbicki obtained Kopera's curriculum vitae and then attempted to verify Kopera's academic credentials. Such actions were clearly the exercise of due diligence. . . .
>
> Did these actions require some Herculean effort? No. The Petitioner introduced a letter from the University of Maryland sent by facsimile to Kulbicki's attorney in which the school Registrar responded "to [the attorney's] fax request for verification of [Kopera's] degree" and confirmed that there was "no record of Mr. Kopera receiving a degree." All that was required in the case was a fax request and a fax reply to uncover Kopera's

---

[9] Hunt further set forth reasons why the newly discovered evidence created purportedly a substantial or significant possibility of a different outcome in his trial. Because those parts of his petition are not relevant to the two questions raised in this appeal, we do not reproduce them here.

fraud. Hardly the expenditure of "unlimited time and resources," as claimed by the Petitioner. The Petitioner further introduced an affidavit from the Registrar for the Rochester Institute of Technology. Based on this affidavit, Kulbicki's attorney merely "requested [the Registrar] to conduct a search for Registration records relating to JOSEPH KOPERA," and the Registrar advised counsel that Kopera had not even attended the school. Such a request was hardly akin to "looking for a needle in a haystack." It was simply the exercise of due diligence.

Memorandum Opinion at 3-4 (citations and footnote omitted).

In its memorandum opinion denying Hunt's petition, the circuit court relied upon the Court of Special Appeals's decision in *Jackson v. State*, 216 Md. App. 347, 86 A.3d 97, *cert. denied*, 438 Md. 740, 93 A.3d 289 (2014), which held, in another Kopera case, as follows:

> In this case, we agree that Mr. Kopera's educational background could have been discovered prior to [Jackson's] trial. That is shown by the fact that another attorney discovered it. Indeed, checking an [opposing] expert's credentials is reasonable trial preparation.
>
> Although there may have been reasons that counsel did not pursue an investigation into Mr. Kopera's credentials, the circuit court did not abuse its discretion in finding that appellant failed to show that the evidence could not have been discovered in the exercise of due diligence. [Jackson's] Petition for Writ of Actual Innocence was properly denied on this ground alone.

*Id.* at 365-66, 86 A.3d at 108 (citations omitted). For the sake of convenience, we shall refer to this hereafter as the "*Jackson* presumption."

Hunt appealed. Our colleagues on the intermediate appellate court affirmed in an unreported opinion. *Hunt v. State*, No. 2429, Sept. Term, 2017 (filed 26 Nov. 2019). In its decision, the Court relied upon the *Jackson* presumption, as well as its decision in *Kulbicki v. State*, 207 Md. App. 412, 53 A.3d 361 (2012), *rev'd*, 440 Md. 33, 99 A.3d 730

8

(2014), *rev'd*, 577 U.S. 1, 136 S. Ct. 2, 193 L. Ed. 2d 1 (2015) (per curiam),[10] to conclude that the circuit court had not abused its discretion in finding an absence of due diligence by trial counsel in failing to discover Kopera's fraud earlier than 2007. *Hunt*, slip op. at 7-11. We granted Hunt's petition for a writ of certiorari, 470 Md. 206, 235 A.3d 31 (2020), to consider the following questions:

1. In affirming the Circuit Court's denial of Petitioner's petition for writ of actual innocence, did the Court of Special Appeals err in holding that the mere fact that Joseph Kopera's false credentials were found years later by another attorney in another case was enough for the trial court to find that Petitioner's trial counsel failed to act with due diligence, as is required for a petitioner to prevail under Md. Code Ann., Crim. Proc. § 8-301(a), where Petitioner's trial took place in 1991, the fact that Kopera had repeatedly lied under oath about his academic credentials was first discovered by the Office of the Public Defender's Innocence Project in 2007, and prior to that disclosure in 2007, neither defense attorneys nor prosecutors had ever questioned Kopera's testimony about his academic credentials in the hundreds of cases in which he had testified?

2. Does the Court of Special Appeals' holding in this case conflict with this Court's "considered *dicta*" in *State v. Hunt*, 443 Md. 238[, 116 A.3d 477] (2015), including this Court's comments that "[a]s an objective fact, attorneys with unlimited time and resources could have discovered Kopera's fraud at any point during that time. We would avoid, however, the negative inference from the opinions of the Court of Special Appeals that no defense attorney representing a defendant at a trial in which Kopera testified exercised due diligence (prior to the discoveries made by the attorneys of the Innocence Project) in failing to discover his charade"?

---

[10] In *Kulbicki*, a postconviction case, the Court of Special Appeals held that "any claims regarding Kopera's perjury" had been waived because "a background investigation would have revealed that Kopera lacked the claimed college degrees," and therefore, "Kulbicki could have raised his contentions on direct appeal." *Kulbicki*, 207 Md. App. at 444, 53 A.3d at 380.

On remand from the Supreme Court, the case was returned to the Court of Special Appeals for further consideration. In an unreported opinion, that court determined that Kulbicki was entitled to a writ of actual innocence because of the admission of dis-credited comparative bullet lead analysis. 2020 WL 41915. We denied the State's petition for certiorari. 468 Md. 235 (2020).

## DISCUSSION

## The Parties' Contentions

Hunt contends that the circuit court erred in finding a lack of due diligence by trial counsel because he failed to discover Kopera's fraud in time to move for a new trial under Maryland Rule 4-331(c). He assails the circuit court's reliance upon the *Jackson* presumption, asserting that it is contrary to "considered dicta" in *Hunt I* and that we should make explicit now what previously we had suggested only. In other words, Hunt urges us to disapprove the so-called *Jackson* presumption, according to which the mere fact that another attorney, in 2007, had uncovered Kopera's fraud demonstrates that any other attorney in a Kopera case, prior to that time, could have performed the same feat.

According to Hunt, several untenable conclusions follow inexorably from the circuit court's ruling: (1) every defense attorney in a Kopera case tried prior to 2007 failed similarly to exercise due diligence; (2) every prosecutor involved in trying those cases during that same time span likewise either failed to exercise due diligence or, even worse, failed his or her obligations to disclose exculpatory evidence to the defense under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and its progeny; (3) similarly situated cases could result in diametrically opposed outcomes, *compare Jackson*, 216 Md. App. at 365-66, 86 A.3d at 107-08 (finding no abuse of discretion in lower court's finding of absence of due diligence because a different attorney had discovered Kopera's fraud) *with McGhie v. State*, 224 Md. App. 286, 299-300, 120 A.3d 828, 835-36 (2015) (finding no abuse of discretion in lower court's finding of due diligence despite trial

10

counsel's failure to discover Kopera's fraud), *aff'd on other grounds*, 449 Md. 494, 144 A.3d 752 (2016); (4) given that courts have held generally that the prosecution has no *Brady* obligation to disclose a "secret fraud" of which it is unaware reasonably,[11] the effect in this case is to impose a greater obligation on defense counsel than on the prosecution to unearth a "secret fraud"; and (5), in sum, *Jackson* imposes "an unrealistic, unworkable standard" upon defense attorneys that amounts to "far more than reasonable due diligence."

The State counters that: (1) there is no conflict between our considered dicta in *Hunt I* and the decisions of the Court of Special Appeals regarding due diligence; (2) courts should follow a case-by-case approach in deciding the merits of actual innocence petitions, including whether the petitioner has satisfied due diligence; (3) researching an opposing expert's credentials prior to trial is reasonably diligent behavior; (4) the circuit court did not abuse its discretion in finding that, given the discovery of Kopera's fraud in 2007 by another attorney in the course of the *Kulbicki* case, Hunt's attorney could have discovered, but did not, that same fraud as relevant to Hunt's 1991 trial; and (5) the *Jackson* presumption does not impose an unworkable standard upon defense attorneys.

**Standard of Review**

"[T]he standard of review when appellate courts consider the legal sufficiency of a petition for writ of actual innocence is *de novo*." *Hunt I*, 443 Md. at 247, 116 A.3d at 482 (citations omitted). "Courts reviewing actions taken by a circuit court after a hearing on a

_____

[11] *See, e.g., Gray v. State*, 388 Md. 366, 384-85, 879 A.2d 1064, 1074 (2005); *French v. State*, 246 Md. App. 609, 624-25, 232 A.3d 266, 275-76 (2019), *cert. dismissed*, 471 Md. 527, 242 A.3d 1121 (2020).

11

petition for writ of actual innocence limit their review, however, to whether the trial court abused its discretion." *Id.* at 247-48, 116 A.3d at 482 (citations omitted).

Because the instant case involves review of a circuit court's decision on the merits of an actual innocence petition, the latter (deferential) standard of review applies. Therefore, we offer the following observations regarding the origins and application of that standard.

Because, as we shall explain, the actual innocence statute was anchored to the motion for new trial on the ground of newly discovered evidence, both this Court and the Court of Special Appeals looked to decisions interpreting Maryland Rule 4-331(c) (governing motions for new trial on the ground of newly discovered evidence) when first interpreting the statute. *See*, *e.g.*, *Douglas*, 423 Md. at 188, 31 A.3d at 269 (recognizing that "decisions on the merits of requests for new trials based on newly discovered evidence, whether filed pursuant to Rule 4-331 or the [actual innocence statute], are committed to the hearing court's sound discretion"); *Jackson*, 216 Md. App. at 363, 86 A.3d at 106 (citing *Miller v. State*, 380 Md. 1, 28, 843 A.2d 803, 819 (2004) (interpreting Rule 4-331(c))), *disapproved on other grounds by Hunt I*, 443 Md. at 263-64 & n.26, 116 A.3d at 492 & n.26; *Keyes v. State*, 215 Md. App. 660, 668-70 & n.6, 84 A.3d 141, 146-47 & n.6 (2014) (citing *Campbell v. State*, 373 Md. 637, 665, 821 A.2d 1, 18 (2003) (interpreting Rule 4-331(c)) and *Douglas*, 423 Md. At 182-83, 31 A.3d at 265-66), *cert. denied*, 438 Md. 144, 91 A.3d 614 (2014).

It is unsurprising that we apply deferential review to a trial court's denial of a motion for new trial. Such a motion is heard nearly always by the same judge who presided over

the trial, typically close enough in time that the trial judge can recall (from memory or notes) the facts of the case.  In *Campbell*, we said that

> the breadth of a trial judge's discretion to grant or deny a new trial is not fixed or immutable; rather, it will expand or contract depending upon the nature of the factors being considered, and the extent to which the exercise of that discretion depends upon the opportunity the trial judge had to feel the pulse of the trial and to rely on his own impressions in determining questions of fairness and justice.

373 Md. at 666, 821 A.2d at 18 (quoting *Buck v. Cam's Broadloom Rugs, Inc.*, 328 Md. 51, 58-59, 612 A.2d 1294, 1298 (1992)).  Moreover, we noted that "the discretion afforded a trial judge 'is broad but it is not boundless,'" *id.* at 665, 821 A.2d at 18 (quoting *Nelson v. State*, 315 Md. 62, 70, 553 A.2d 667, 671 (1989)), and that, specifically, in "the context of the denial of a motion for a new trial in a criminal case, . . . 'under some circumstances a trial judge's discretion to deny a motion for a new trial is much more limited than under other circumstances.'"  *Id.* at 666, 821 A.2d at 18 (quoting *Merritt v. State*, 367 Md. 17, 29, 785 A.2d 756, 764 (2001)).

In applying these principles to appellate review of a circuit court's denial of an actual innocence petition, we note that several of the factors articulated in *Buck*, weighing in favor of broader deference to a circuit court's denial of a motion for new trial, are more attenuated in a case such as that before us.  For one thing, the judge ruling on the merits of an actual innocence petition typically has no "opportunity . . . to feel the pulse of the trial" and to rely on his or her "own impressions in determining questions of fairness and

justice."[12] Moreover, with respect to the questions before us here, the case is akin to a test case in complex, multiple-party litigation—the due diligence issue in virtually every case in which Kopera testified prior to the 2007 Innocence Project discovery of his fraud is essentially the same, unless a case may reveal specific knowledge possessed by or imputable to defense counsel so as to put counsel on inquiry notice that would trigger a reasonably competent attorney to look into Kopera's credentials. Furthermore, given the large number of cases affected potentially, the taint of the Kopera charade implicates the integrity of the criminal justice system in our State. It is, therefore, in the public interest to advance a uniform decisional norm to guide the circuit courts so as to ensure that similarly situated cases are decided consistently. We conclude that, under the unique circumstances of this category of cases (the "Kopera cases"), the circuit court's discretion is narrowed.

## Analysis

The actual innocence statute was enacted to alleviate a perceived problem faced by convicted persons seeking to challenge their convictions on the ground of newly discovered evidence, namely, that, under some circumstances, a claim of newly discovered evidence was time-barred despite the due diligence of the claimant in raising it as soon as feasible.

---

[12] In the instant case, Hunt's original actual innocence petition was filed nineteen years after his trial. In *State v. Seward*, 220 Md. App. 1, 102 A.3d 798 (2014), *rev'd on other grounds*, 446 Md. 171, 130 A.3d 478 (2016), the actual innocence petition was filed twenty-five years after the trial. *Id.* at 10, 102 A.3d at 803. It is not surprising that a Section 8-301 petition may be filed long after trial, given that the statute provides expressly that a petition may be filed "at any time," provided, of course, that the newly discovered evidence could not have been discovered previously. CP § 8-301(a).

14

Taking a broader view of the historical context, we note that, as recently as the early 1960s, although a postconviction petition could be filed then "at any time," Md. Code (1957, 1959 Cum. Supp.), Art. 27, § 645A(b),[13] a claim of newly discovered evidence (which is not cognizable in a postconviction proceeding, *Daniels v. Warden*, 223 Md. 631, 632, 161 A.2d 461, 462 (1960)) could not be raised more than three days after a verdict had been rendered. *Giles v. State*, 231 Md. 387, 388, 190 A.2d 627, 628 (1963) (per curiam); Md. Rule 567 (a) (1962). During the intervening decades, that time limit was liberalized in stages. *See State v. Matthews*, 415 Md. 286, 299-312, 999 A.2d 1050, 1058-66 (2010) (setting forth the history of what is now Maryland Rule 4-331). Nonetheless, as of 2009, except in capital cases, or unless the newly discovered evidence was DNA evidence (or possibly evidence disclosed by means of any other new, widely recognized, scientific technique that would demonstrate actual innocence), a claim of newly discovered evidence in a criminal case could not be raised generally more than one year after the final mandate had issued upon the exhaustion of all direct appeals. Md. Rule 4-331(c) (2009).

In that context, the General Assembly enacted CP § 8-301 to remedy the problem. 2009 Md. Laws, ch. 744. Section 8-301 has been a bit of an enigma. Although it lacks an express provision governing appeals, we have interpreted it as permitting a direct appeal if a petition is denied, *Douglas v. State*, *supra*, 423 Md. 156, 31 A.3d 250, but not if it is

---

[13] Since 1 October 1995, there has been a ten-year statute of limitations for filing a postconviction petition, although there are "safety valve" provisions (e.g., motions to reopen, extraordinary cause) that, under very limited conditions, permit petitions filed beyond that time limit. 1995 Md. Laws, ch. 258. We note in passing that the Uniform Postconviction Procedure Act now is codified at Title 7 of the Criminal Procedure Article.

15

granted. *Seward v. State*, 446 Md. 171, 130 A.3d 478 (2016). In so interpreting the statute, we have determined that it is, in essence, akin to a motion for new trial on the ground of newly discovered evidence, albeit unencumbered by the time limits of Rule 4-331(c). Thus, unlike a proceeding under Title 7 of the Criminal Procedure Article (Uniform Postconviction Procedure Act), a proceeding under section 8-301 is not a separate, collateral proceeding.[14] In other words, "the remedy afforded under" section 8-301, "like the similar (albeit more restricted) remedy provided by a motion for new trial, is necessarily part of the usual procedures of trial and review available to a criminal defendant that were not intended to fall within the scope of postconviction relief[.]" *Douglas*, 423 Md. at 177, 31 A.3d at 262-63 (citations and quotations omitted).[15]

Although a petition under section 8-301 may be filed "at any time," we have determined further that the scope of a claim that may be brought is narrower than permitted under Rule 4-331(c). Thus, unlike the scope of claim permitted in a motion for new trial under Rule 4-331(c), which is constrained only by the requirement that the proponent demonstrate a "substantial or significant possibility" that, had the newly discovered

---

[14] *See Md. State Bar Ass'n v. Kerr*, 272 Md. 687, 689-90, 326 A.2d 180, 181 (1974) (observing that a postconviction proceeding is "an independent and collateral civil inquiry into the validity of the conviction and sentence," not "a part of the original criminal cause"). Similarly, we have said that coram nobis also is a separate, collateral, civil proceeding. *Ruby v. State*, 353 Md. 100, 107, 724 A.2d 673, 677 (1999).

[15] In contrast to the actual innocence statute, the DNA postconviction statute, CP § 8-201, is tethered to the Uniform Postconviction Procedure Act. If a convicted person succeeds in moving for DNA testing of physical evidence from his trial and the results of that testing are favorable to him, a postconviction proceeding must be initiated. *Id.* § (i).

16

evidence been before the fact finder, its verdict would have been different, *Yorke v. State*, 315 Md. 578, 588, 556 A.2d 230, 235 (1989), a claim of newly discovered evidence cognizable under section 8-301 must include a statement "that the conviction sought to be vacated is based on an offense that the petitioner did not commit[.]" Md. Rule 4-332(d)(9). *See Yonga v. State*, 221 Md. App. 45, 57-58, 108 A.3d 448, 455 (2015) (comparing a motion under Rule 4-331(c) and a petition under CP § 8-301 and concluding that only the latter requires a showing of actual innocence), *aff'd*, 446 Md. 183, 130 A.3d 486 (2016).[16]

Although the actual innocence statute has been amended several times since its original enactment, the statutory language at issue has remained unchanged and reads:

> A person charged by indictment or criminal information with a crime triable in circuit court and convicted of that crime may, at any time, file a petition for writ of actual innocence in the circuit court for the county in which the conviction was imposed if the person claims that there is newly discovered evidence that . . . **could not have been discovered in time to move for a new trial under Maryland Rule 4-331**.

CP § 8-301(a) (emphasis added).

Our sole task here is to interpret the bolded language in the context of the class of Kopera cases. Turning to Rule 4-331(c), which defines the outermost time limit in the rule, we observe that it provides that a court "may grant a new trial or other appropriate relief on the ground of newly discovered evidence which could not have been discovered by due diligence in time to move for a new trial pursuant to section (a) of this Rule [i.e., within

---

[16] In response to *Yonga*, which held that a person convicted via a guilty plea was ineligible to invoke the remedy afforded under section 8-301, the General Assembly amended the statute to permit, under a heightened burden of persuasion, a person convicted via a guilty plea to raise thereafter a claim of actual innocence. 2018 Md. Laws, ch. 602.

ten days after a verdict]." Thus, the actual innocence statute incorporates by reference the due diligence requirement of Rule 4-331(c). That, of course, is why we (and our colleagues on the Court of Special Appeals) look to decisions interpreting Rule 4-331(c) in interpreting the statute.

In *Argyrou v. State*, 349 Md. 587, 709 A.2d 1194 (1998), a Rule 4-331(c) case, we said that to "qualify as 'newly discovered,' evidence must not have been discovered, or been discoverable by the exercise of due diligence, within ten days after the jury has returned a verdict." *Id.* at 600-01, 709 A.2d at 1200-01 (footnotes omitted). In a footnote, we noted further that "[e]xculpatory evidence known, at the time of trial, or, as in Maryland, prior to the expiration of the time for filing a motion for new trial, though unavailable, in fact, is not newly discovered evidence, and, thus, will not suffice as a ground on which to grant a new trial." *Id.* at 600 n.9, 709 A.2d at 1200 n.9 (citations omitted).

Whether evidence is newly discovered "has two aspects": a "temporal one," that is, when the evidence was discovered; and a "predictive one," that is, when it "should" or "could" have been discovered. *Id.* at 602, 709 A.2d at 1201. "Due diligence" is relevant to the latter aspect, *id.*, and, in this context, "contemplates that the defendant act reasonably and in good faith to obtain the evidence, in light of the totality of the circumstances and the facts known to him or her." *Id.* at 605, 709 A.2d at 1203.

The Court of Special Appeals has elaborated further as to what due diligence requires. In *Love v. State*, 95 Md. App. 420, 621 A.2d 910, *cert. denied*, 331 Md. 480, 628 A.2d 1067 (1993), the Court declared that although "the exercise of diligence and the effective assistance of counsel unquestionably overlap, they are not necessarily

18

coterminous." *Id.* at 436, 621 A.2d at 919.  More recently, in *State v. Seward*, *supra*, 220 Md. App. 1, 102 A.3d 798, the Court of Special Appeals, relying upon *Love*, applied this distinction to conclude that it was possible for trial counsel not to have rendered ineffective assistance in failing to unearth evidence, which existed at the time of trial, yet, at the same time, not to have exercised due diligence.  *Id.* at 18-22, 102 A.3d at 808-11.  We had no occasion to examine this holding because we held, in *Seward*, 446 Md. 171, 130 A.3d 478, that the Court of Special Appeals lacked appellate jurisdiction in that case and reversed on that basis.

The holding of the Court of Special Appeals in *Seward* has been criticized for drawing this distinction between the reasonableness required of trial counsel in the context of a *Strickland* claim[17] and the due diligence (that is, reasonableness and good faith) required in the context of a newly discovered evidence claim.  *See* Michael H. Cassel, Note, *Coulda, Woulda, Shoulda:  The  Relationship Between Ineffective Assistance of Counsel, Due Diligence, and the "Could Have Been Raised Earlier" Bar in Postconviction Litigation*, Colum. J.L. & Soc. Probs. 45, 48-50, 72-77 (2015).  Hunt now suggests that we should clarify that the standards of attorney performance in the *Strickland* context and the newly discovered evidence context are substantially the same.  We are not unsympathetic

---

[17] In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court set forth the standard applicable to a claim of ineffective assistance of counsel, in violation of the Sixth Amendment guarantee.  The Court established a two-prong test:  performance and prejudice.  Regarding performance, the Court stated that the "proper measure of attorney performance" is "reasonableness under prevailing professional norms."  *Id.* at 688, 104 S. Ct. at 2065, 80 L. Ed. 2d at 694.

to this argument, but we shall leave that issue for another day, as it is not necessary to reach it in order to decide the matter before us.

The circuit court, and the State in its brief, emphasize that the evidence of Kopera's fraud *could* have been discovered at the time of Hunt's trial. Although that proposition may be attractive in a more perfect world, we think it reflects a cramped and unrealistic notion, under the circumstances of the Kopera cases, of the reasonableness and good faith envisioned in the due diligence standard. Simply put, Kopera was, prior to the unearthing of his fraud, regarded widely as a trained and knowledgeable expert in ballistics who had been accepted to testify in courts throughout Maryland and several neighboring jurisdictions for decades before 2007. It appears that no cause was given, nor did it occur reasonably to any defense counsel until 2007 to question his credentials.[18] We reject the implication that all of these attorneys, over a period spanning decades, failed to exercise due diligence. Simply put, the failure of anyone to unearth Kopera's fraud prior to its fortuitous discovery, by an exceptionally diligent attorney working for the Innocence Project, who, apparently, had read transcripts from many earlier Kopera trials and noticed inconsistencies that set her on a path of deeper exploration of his claimed credentials, is evidence that it was not reasonable to expect that a hypothetical reasonable and competent attorney would have stumbled onto this discovery prior to 2007. That an expert who was

---

[18] We could not discover records indicating whether Kopera's academic qualifications were subjected to *voir dire* early in his career as a State's expert witness, a time when one may expect most reasonably that he would have been tested in this regard. Thus, we do not know whether anyone over the decades until 2007 looked critically into his claimed educational record.

so widely respected as Kopera before 2007 had been misrepresenting his credentials in scores of cases appears unimaginable to anyone prior to the discovery of his fraud.

We hold that, in this and all similarly situated cases tried prior to the 2007 discovery of Kopera's fraud, in the absence of particularized facts that would have put defense counsel on inquiry notice of Kopera's fraud, due diligence did not require defense counsel to unearth the unfortunate charade. This is (hopefully) a unique class of cases. Parties in non-Kopera cases should be chary of transposing our reasoning in this case to other cases not similarly situated. As for this case, because the circuit court did not assess whether Hunt could establish a substantial or significant possibility that, had Kopera's false testimony about his credentials been known at the time of his trial, the result of his trial may have been different, we order a remand so that the court may make that determination.

Because the circuit court will have the task of determining whether Hunt can demonstrate "a substantial or significant possibility that the result [of his trial] may have been different," CP § 8-301(a)(1)(i), we take this opportunity to offer guidance regarding a possible misunderstanding in some of our prior decisions applying the prejudice standard. In *Yorke*, 315 Md. 578, 556 A.2d 230, we set forth a bifurcated test for weighing the impact of newly discovered evidence: first, a court should determine whether the evidence is "material" to the outcome of the case, *id.* at 583, 556 A.2d at 232; and second, if so, whether there is "a substantial or significant possibility that the verdict of the trier of fact would have been affected." *Id.* at 588, 556 A.2d at 235. The origin of this bifurcated test was *Stevenson v. State* ("*Stevenson II*"), 299 Md. 297, 473 A.2d 450 (1984), in which we were

21

asked, for the first time, what standard a defendant must meet to warrant the grant of a new trial on the ground of newly discovered evidence.

Stevenson had been convicted of first-degree murder of her husband and setting a fire while perpetrating a crime.[19]  The judgments were affirmed on appeal, *Stevenson v. State* ("*Stevenson I*"), 289 Md. 167, 423 A.2d 558 (1980), *overruled by Unger v. State*, 427 Md. 383, 417, 48 A.3d 242, 261 (2012),[20] but nearly two years after trial, the prosecutor discovered that a State's witness, Dennis Michaelson, had misrepresented his credentials while testifying at Stevenson's trial.  *Stevenson II*, 299 Md. at 300, 473 A.2d 451.  The prosecutor notified Stevenson's trial counsel, who filed a motion for new trial on the

---

[19] At the time, there was a separate provision that proscribed, while perpetrating or attempting to perpetrate a crime, setting fire to or burning "any of the buildings enumerated in" the Arson and Burning Subtitle.  Md. Code (1957, 1976 Repl. Vol.), Art. 27, § 11.  That statute was repealed subsequently in light of the penalties attaching to burning a structure under other statutory provisions, 1993 Md. Laws, ch. 228, at 1582, 1589, and thus there is no precise counterpart to Art. 27, § 11 in the Criminal Law Article.

[20] The issue addressed in *Stevenson I* was whether the first paragraph of Article 23 of the Maryland Declaration of Rights (jury as judges of the law) was in violation of the Due Process Clause of the Fourteenth Amendment.  Attempting to avoid a perceived conflict with the Federal constitutional provision, the *Stevenson I* Court adopted a novel interpretation of Article 23 which rendered it a dead letter effectively (and also invalidating henceforth advisory jury instructions in criminal trials).  Because that novel interpretation of Article 23 purported to be grounded in long-standing Maryland common law, *Stevenson I* gave it full retrospective effect.  In a deft sleight-of-hand, *Unger* retained the novel interpretation and the retrospective effect, but overruled that part of *Stevenson I* purporting to hold that the new interpretation of Article 23 was grounded in long-standing Maryland common law.  The *Unger* Court's apparent purpose in doing so was to permit persons convicted under advisory jury instructions to raise collateral attacks on their convictions without having to overcome the bar of waiver.

ground of newly discovered evidence shortly before the deadline for doing so.[21] *Id.* at 300 & n.2, 473 A.2d at 451 & n.2.

One of the principal issues in Stevenson's trial was the origin of the fire. According to the prosecution, Stevenson had set her husband on fire, while she claimed that the fire had started spontaneously. The trial devolved into a battle of experts. *Id.* at 299-300, 473 A.2d at 451. "Approximately forty witnesses testified for the state, including nine experts in the case in chief, and four experts on rebuttal," whereas the "defense called seventeen witnesses, including five experts." *Id.* at 300, 473 A.2d at 451.

Michaelson, the State's witness who falsified his credentials, had testified in rebuttal. Following a hearing, the trial court declared that it was convinced "beyond a reasonable doubt that the State presented a case without the testimony of Mr. Michaelson that overwhelmingly pointed to the guilt of the accused" and therefore denied Stevenson's motion. *Id.* at 301, 473 A.2d at 451. Stevenson appealed, and the Court of Special Appeals affirmed. The matter reached this Court following the grant of Stevenson's certiorari petition. *Id.*

The issue on appeal was what standard a trial court should apply in deciding whether to grant a new trial on the ground of newly discovered evidence. The rule then in effect, Rule 770 (b), like its present-day counterpart, Rule 4-331(c), did not set forth expressly any standard "except to denote the exercise of discretion through the use of the word

---

[21] The rule in effect at the time, former Maryland Rule 770 (b) (the predecessor to Rule 4-331(c)), required (as does the current rule) that a motion for new trial on the ground of newly discovered evidence be filed no later than one year after the mandate issues from the Court of Appeals.

23

'may.'" *Stevenson II*, 299 Md. at 301, 473 A.2d at 451. We sidestepped the question, observing that, "because the trial judge expressly found . . . that the state's evidence without Michaelson's testimony overwhelmingly pointed to" Stevenson's guilt, he had "implicitly concluded that the newly discovered evidence was not material to the outcome of the case." *Id.* at 301-02, 473 A.2d at 452. Concluding that materiality is "a threshold question," we declared that it "should be decided in the affirmative" before examining "the possible impact the newly discovered evidence would have on the outcome of the trial," and we affirmed but did not further define "material." *Id.* at 302, 473 A.2d at 452.

Then, in *Yorke*, 315 Md. 578, 556 A.2d 230, we were faced with the question we had sidestepped in *Stevenson II* and answered it: the standard a trial court should apply, in determining whether to grant or deny a motion for new trial on the ground of newly discovered evidence, is whether "there was a substantial or significant possibility that the verdict of the trier of fact would have been affected," had the newly discovered evidence been available at trial. *Id.* at 588, 556 A.2d at 235. That is the standard now codified in CP § 8-301(a)(1)(i). The only reference to "material" in that opinion was to uphold, under an abuse of discretion standard, the trial court's determination that the newly discovered evidence "touch[ed] upon the evidence that was presented" at trial and was therefore material. *Id.* at 585, 556 A.2d at 233.

We elaborated briefly in *Argyrou*, *supra*, 349 Md. 587, 709 A.2d 1194, stating that for evidence to be "material," it "must be more than 'merely cumulative or impeaching.'" *Id.* at 601, 709 A.2d at 1201 (quoting *Jones v. State*, 16 Md. App. 472, 477, 298 A.2d 483, 486 (1973)). Similar language appeared in *Love*, *supra*, 95 Md. App. 420, 621 A.2d 910,

24

where our colleagues on the intermediate appellate court drew a distinction between "impeaching" and "merely impeaching" in the context of assessing "materiality." *Id.* at 432-33, 621 A.2d at 917. More recently, in *Hunt I*, 443 Md. 238, 116 A.3d 477, we disapproved this "overly rigid" framework. *Id.* at 263-64, 116 A.3d at 492.

We would be remiss if we failed to point out that the actual innocence statute was drafted with the specific understanding that the *Yorke* standard was well-established in Maryland law and applies, not only to motions for new trial on the ground of newly discovered evidence, but also to ineffective assistance claims, *Bowers v. State*, 320 Md. 416, 425-27, 578 A.2d 734, 738-39 (1990), and *Brady* claims (so long as they do not involve knowing use of perjured testimony by the prosecution). *Yearby v. State*, 414 Md. 708, 717-18, 997 A.2d 144, 149 (2010). Yet, neither ineffective assistance claims nor *Brady* claims are subject to a bifurcated test. Indeed, in the *Brady* context, the Supreme Court has said that "materiality" is co-extensive with the "reasonable probability" (i.e., "substantial or significant possibility") standard. *Strickler v. Greene*, 527 U.S. 263, 280-82, 119 S. Ct. 1936, 1948-49, 144 L. Ed. 2d 286, 301-02 (1999); *Kyles v. Whitley*, 514 U.S. 419, 433-34, 115 S. Ct. 1555, 1565, 131 L. Ed. 2d 490, 505 (1995). Because we can envision no instance in which newly discovered evidence satisfies the "substantial or significant possibility" test, but could be deemed not "material," we clarify that it is not necessary to conduct a "threshold" screening as suggested by *Yorke*. Weighing the effect of newly discovered evidence in an actual innocence proceeding involves substantially the same inquiry as determining prejudice in the context of an ineffective assistance claim or assessing whether *Brady* evidence is material.

25

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE AND REMAND TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**

Circuit Court for Baltimore City
Case No. 191136027
Argued: December 8, 2020

IN THE COURT OF APPEALS

OF MARYLAND

No. 21

September Term, 2020
_____

RONNIE HUNT

v.

STATE OF MARYLAND
_____

McDonald
Watts
Hotten
Getty
Booth
Biran
Harrell, Glenn T., Jr.,
        (Senior Judge, Specially Assigned),

JJ.
_____

Concurring Opinion by Biran, J.,
which Watts, J., joins.
_____

Filed: June 7, 2021

Respectfully, I concur in the judgment reached by the Majority, but I am unable to join the Majority Opinion.

Whether any particular defense attorney exercised due diligence in a particular case where Joseph Kopera testified as an expert for the State turns on the specific facts and circumstances of that case. Rightfully so, the Majority criticizes what it refers to as the "*Jackson* presumption." *See* Maj. Op. at 8. In *Jackson v. State*, 216 Md. App. 347, 365-66 (2014), the Court of Special Appeals held that, "[a]though there may have been reasons that counsel did not pursue an investigation into Mr. Kopera's credentials," the circuit court did not abuse its discretion in finding that Jackson had failed to show that the evidence of Kopera's fabrications could not have been discovered in the exercise of due diligence. The Court of Special Appeals reasoned that the discovery of Kopera's fraud in 2007 by another attorney demonstrated that Jackson's trial counsel could have made the same discovery in time to move for a new trial under Maryland Rule 4-331. *Id.*; *see* Md. Code, Crim. Proc. ("CP") § 8-301(a)(2) (2018 Repl. Vol.) (referencing Md. Rule 4-331).

I agree with the Majority that a hearing judge may not decide the threshold diligence question in an actual innocence case based on Kopera's false testimony by employing the *Jackson* presumption, under which every attorney who failed to discover Kopera's fabrications is deemed to have failed to exercise due diligence. However, in my view, the Majority goes astray by adopting the diametrically opposite presumption that every defense attorney who failed to discover Kopera's falsehoods is deemed to have exercised due diligence.

Neither presumption should be the basis for determining whether an attorney could have discovered the evidence of Kopera's fabrications through the exercise of due diligence. Instead, I agree with Hunt's counsel in the actual innocence hearing, who, when asked by the circuit court whether it should be "standard operating procedure" for defense counsel to check the qualifications of every expert witness proffered by the State, replied that "[i]t would depend on the case. And every case is different." Although Kopera's fabrications may not vary from case to case, the circumstances that bear on a defense attorney's decision not to investigate Kopera's academic qualifications may well vary from case to case. Based on those differences, the same judge hearing two Kopera-based actual innocence cases may decide the threshold diligence question differently in each case. Viewed in this context, the Majority's concern about inconsistent diligence rulings in "Kopera cases," *see* Maj. Op. at 14, is misplaced.

Seemingly anticipating concerns about its unprecedented elimination of the diligence showing, the Majority offers two points to try to ease such misgivings. First, the Majority states that "[p]arties in non-Kopera cases should be chary of transposing [the Majority's reasoning] in this case to other cases not similarly situated." Maj. Op. at 21. Second, the Majority suggests that the diligence requirement will not be excused in cases where "specific knowledge possessed by or imputable to defense counsel … put him or her on inquiry notice that would trigger a reasonably competent attorney to look into Kopera's credentials." *Id*. at 14; *see also id.* at 21 (excluding from the Majority's holding cases where "particularized facts … would have put defense counsel on inquiry notice of Kopera's

fraud"). These points only further demonstrate that the Majority's new presumption is ill-advised.

First, despite the caveat, the Majority's holding may well prove difficult to limit to Kopera cases. Indeed, the Majority articulates no limiting principle to guide the lower courts in determining how many attorneys must have failed to discover a piece of evidence before the court should assume that none of the attorneys failed to exercise reasonable diligence. It offers only that "[t]his is (hopefully) a unique class of cases." Maj. Op. at 21. That is little comfort to anyone who is concerned that the Majority's judicially-created exception to the diligence requirement will swallow the rule set forth in CP § 8-301(a)(2). In any future case involving a type of newly discovered evidence that applies to more than one past case, the first actual innocence petitioner to claim relief under CP § 8-301 will undoubtedly argue that the case is sufficiently "akin to a test case in complex, multi-party litigation," Maj. Op. at 14, to warrant waiver of the requirement to prove due diligence. The theory being that if at least two attorneys managed to miss the evidence, it is unlikely that both or all failed to exercise due diligence. Under the standard espoused by the Majority, it is more likely that where multiple attorneys miss the same type of evidence, an attorney who subsequently uncovers the evidence will be viewed as an "exceptionally diligent attorney," *id.* at 20, and we would assume that the prior attorneys could not have located the evidence exercising only "due" diligence. The Majority's approach in setting forth a presumption with regard to finding due diligence, rather than requiring factfinding by a circuit court judge based on evidence, runs counter to this Court's precedent, which requires a court to consider the "totality of the circumstances and the facts known to

[defense counsel]" when deciding whether defense counsel exercised due diligence. *Argyrou v. State*, 349 Md. 587, 605 (1998). In my view, the inevitable result of the Majority's approach will be to confuse a subsequent attorney's reasonable diligence for exceptional diligence, thereby excusing the failure of prior attorneys to exercise reasonable diligence.

Second, the Majority's suggestion that the diligence requirement will not be excused in cases where "specific knowledge possessed by or imputable to defense counsel … put counsel on inquiry notice that would trigger a reasonably competent attorney to look into Kopera's credentials," Maj. Op. at 14, necessarily alleviates a petitioner of the burden to establish due diligence and transfers the burden to the State to prove the facts giving rise to such inquiry notice. That is the case because, with the benefit of what may henceforth be known as the "*Hunt* presumption," no actual innocence petitioner will produce facts showing that trial counsel was on inquiry notice of a potential problem with Kopera's qualifications. It will be up to the State to find and introduce evidence that defense counsel was on such inquiry notice. This is contrary to the actual innocence statute, which states that "[a] petitioner in a proceeding under this section has the burden of proof." CP § 8-301(g); *see also State v Hunt*, 443 Md. 238, 258 (2015) (in this Court's prior decision in this case, stating that it is the actual innocence petitioner who must convince a hearing judge that evidence concerning Kopera's fabrications could not have been discovered in time to move for a new trial); *State v. Seward*, 220 Md. App. 1, 19 (2014) (actual innocence petitioner "must show that there is newly discovered evidence that could not have been discovered in time to move for a new trial under Maryland Rule 4–331, …

- 4 -

a requirement known as 'due diligence'") (some internal quotation marks and footnote omitted), *rev'd on other grounds by Seward v. State*, 446 Md. 171 (2016). Simply put, this Court is not free to override the General Assembly's placement of the burden of proof in an actual innocence proceeding on the petitioner and shift it to the State when the case under review is a "Kopera case."

Although the Majority goes too far in adopting a new presumption of due diligence in all Kopera cases, in the end, I agree that the judgment of the Court of Special Appeals should be reversed. Conducting the case-by-case analysis that should apply in all actual innocence cases, I believe that Hunt showed his trial counsel exercised reasonable diligence. Hunt's trial occurred in 1991, when Kopera had been a firearms examiner for Baltimore City for approximately 22 years. At the beginning of Kopera's testimony, Hunt's experienced, Baltimore-based trial counsel, Paul Polansky, attempted to stipulate to Kopera's qualifications:

| [PROSECUTOR]: | … And could you briefly give your brief history of your expertise in the area of ballistics. |
| [KOPERA]: | Yes. |
| THE COURT: | He can. Make it as brief as you can. |
| [KOPERA]: | Yes. As stated previously – |
| MR. POLANSKY:[1] | Judge, I would stipulate to his expertise. |
| THE COURT: | I'm sure you will. |
| MR. POLANSKY: | We will. We've heard it, Your Honor. |
| THE COURT: | So have I, but the jury has not. |

Kopera then testified about his qualifications, which included his false claims that he held "a degree in mechanical engineering from the University of Maryland and also an

---

[1] The trial transcript misspelled Mr. Polansky's last name as "Polanski."

engineering degree from the Rochester Institute of Technology." At the conclusion of Kopera's direct examination, the trial judge asked defense counsel whether their cross-examinations of Kopera would be lengthy. Counsel for Hunt's co-defendant, Howard Cardin (also an experienced Baltimore criminal defense attorney), replied: "Lengthy? I can't imagine it being lengthy. I mean, what happens is, sometimes when you ask Joe a question, you think it's a one-word answer and he goes on for a few minutes. But beyond that, no, I don't think it'll be lengthy." In short, the record reflects that both defense counsel and the trial judge by Hunt's 1991 trial were well familiar with Kopera and accorded him significant respect as an expert witness, which are circumstances that may not be present in other cases.

In addition, Kopera's testimony was, to a significant extent, helpful to Hunt. This was a key part of Hunt's argument at the actual innocence hearing. Although Kopera linked the bullet that killed the victim, Sheldene Simon, with a .40 caliber Glock recovered in a car in which Hunt and his co-defendant were traveling, other aspects of Kopera's testimony helped Messrs. Polansky and Cardin develop the theory that an alternate perpetrator had killed Simon. Simon's murder was the third of four shootings that were referenced during Hunt's trial, all of which occurred over the course of eight days and within a mile-and-a-half of one another. On April 6, 1991, the home of Simon's girlfriend, Cherome Hines, was shot at while Simon was there. On April 10, the home of Anthony Payne was struck by gunfire. Less than an hour later, Simon was shot and killed in front of his home. And, on April 13, Payne was shot and killed in front of his home.

Kopera testified that the weapons used in the Simon homicide were also used in the shooting at Hines's home. Those weapons included not only the Glock recovered from the car in which Hunt and Johnson were traveling, but also two unrecovered nine-millimeter weapons. One of those weapons, according to Kopera, was a Taurus pistol that was also used in the Payne shooting. Mr. Polansky argued that there were "a lot of people" who had reason to kill Simon, and relied on Kopera's ballistics testimony to give substance to the defense's claim that Simon's killing was "a reaction" to the April 10 attempt to kill Payne, which Mr. Polansky claimed "had absolutely nothing to do with Ronnie Hunt." Mr. Polansky argued that the police "decided prematurely" that Hunt was guilty, and overlooked Payne and his associates as alternate suspects.

From my perspective, given the two-decade span during which Kopera had apparently testified without challenge to his qualifications, as well as Mr. Polansky's (and Mr. Cardin's) familiarity with, and obvious respect for, Kopera at the time of Hunt's trial and Mr. Polansky's assessment that Kopera's testimony was helpful to the defense, Hunt met his burden to show that Mr. Polansky's failure to discover Kopera's fabrications was not the result of a failure to exercise due diligence.[2]

---

[2] Hunt attempted to introduce an affidavit from Mr. Polansky at the actual innocence hearing, but the hearing judge ruled that it was inadmissible hearsay. In my view, an actual innocence petitioner in a Kopera case should offer the live testimony of trial counsel at the hearing (if trial counsel is available), so that trial counsel can explain whether they attempted to check Kopera's qualifications before trial and/or in time to move for a new trial under Maryland Rule 4-331 and, if they did not do so, why that was the case. Unfortunately, the Majority obviates the need for a petitioner to elicit such testimony from trial counsel.

Accordingly, I would reverse the judgment of the Court of Special Appeals, but for different reasons than those stated by the Majority.

Judge Watts has authorized me to state that she joins in this opinion.